MARY COCHONOUR *et al.*

*v.*

MOSES RATCLIFF.

*Opinion filed October 23, 1906.*

DEEDS—*when deed made to defraud will not be set aside.* Courts will not interfere, at the instance of the grantor, to set aside a deed made to defeat the claims of creditors, where there was no fraud, undue influence or misrepresentations on the part of the grantees, who were ignorant of the grantor's intention until after he·had executed and recorded the deed.

WRIT OF ERROR to the Circuit Court of Cumberland county; the Hon. J. W. CRAIG, Judge, presiding.

On October 20, 1905, the defendant in error, Moses Ratcliff, by Walter Brewer, his next friend, filed his bill for relief in the circuit court of Cumberland county, against the plaintiffs in error, Mary Cochonour, George Ratcliff and Alva Ratcliff. The bill alleged that on September 9, 1901, the complainant was the owner of about thirty acres of land in Cumberland county and six lots in the original town of Pleasantville, in that county; that on the day aforesaid he made, executed and delivered a warranty deed for the real estate to his sons, George Ratcliff and Alva Ratcliff, and his daughter, Mary Cochonour; that the grantees at the time of the conveyance expressed great concern for the grantor and pretended to be interested in his welfare and future comfort in his declining years; that he was old and had great affection for his children, and was influenced and induced by them, through persuasion, to make the deed; that they used many undue arts and fraudulent practices and resorted to falsehoods and misrepresentations in securing said deed, and particularly that they represented that unless the conveyance was made the creditors of the grantor would levy upon the real estate and take it from him and ·his wife, and they would be at the mercy of the world, without a

home or any means of support; that the grantor, having the utmost confidence in his children and in their good faith in the matter, executed the deed while under such influence, in order that he and his wife might save themselves a home; that the grantees represented that after the danger of creditors was over they would re-convey said property to the grantor, which representations were false and made by the grantees in order to get control and dominion over the property; that no consideration was paid for the transfer and that the property conveyed was worth $2500, and was sufficient to keep the grantor in his declining years if title was vested in him. The bill further alleged that immediately after the execution of the deed the grantees began a course of inhuman treatment towards the grantor, treating him harshly and unkindly, until he was compelled to quit their home and move away, and they prohibited him from visiting among his friends and acquaintances and restrained him from all pleasure and stinted him in the actual necessaries of life; that in his absence and against his will they procured to be entered in the probate court of Cook county an order appointing a conservator for him; that at the time of said appointment he was sick in bed and without means to attend court or to employ counsel to resist the order of such appointment, and. that, as such appointed conservator, his daughter, Mary Cochonour, took charge of said land and had received all rents and profits therefrom and converted the same to her own use; that the grantees conspired and prevented him from going among his friends, fearing he would file a bill to set the deed aside. The prayer was for a writ of injunction restraining the grantees from conveying, encumbering, leasing or in any manner disposing of the land, or any part thereof, until the further order of the court, and that upon a final hearing the deed be set aside and declared null and void.

An injunction was issued against the defendants, and upon their appearance they filed a demurrer to the bill,

which was overruled, whereupon they filed their answer denying the material allegations of the bill as to the fraud, undue influence, mistreatment and promise to re-convey as alleged. Upon a hearing in open court before the chancellor a decree was entered setting aside the deed of conveyance from the grantor to the three grantees, and also a subsequent deed of conveyance made by Alva Ratcliff and Mary Cochonour. To reverse this decree a writ of error has been prosecuted to this court.

W. C. GREATHOUSE, and L. L. LOGAN, for plaintiffs in error.

BREWER & BREWER, and LYLE DECIUS, for defendant in error.

Mr. JUSTICE WILKIN delivered the opinion of the court:

Several grounds of reversal are urged by plaintiffs in error, but all of them go to the right of defendant in error to the relief prayed in his bill under the evidence offered in support thereof.

The evidence shows that at the time the bill was filed the defendant in error was eighty-five years of age. He had lived in Cumberland county for forty years. Just prior to the time of the conveyance in question his family consisted of his wife and three grown sons and one daughter. In 1900 the oldest son, Thomas Ratcliff, who resided at Greenup, Illinois, became insane and died. Shortly after his death several notes were presented for payment bearing the name of Thomas Ratcliff and his father, Moses Ratcliff. The father insisted that all of these notes were forgeries and that he had not signed any of them. Suit was commenced upon them and judgment rendered for their full amounts. In the enforcement of their payment the greater part of the defendant in error's property was consumed, including eighty acres of land. The old gentleman became very much worried for fear other notes would appear and the remain-

der of his property be swept away, leaving him homeless and penniless in his old age. He claims that there were many consultations with his wife and children as to the manner of avoiding payment in case other notes were presented. He also claims that as a result of these consultations the deed in question was executed. At the time of the execution of the deed Mary Cochonour and George Ratcliff lived in Chicago and were not present when it was signed and acknowledged. The defendant in error of his own free will and accord went to a notary public and executed the deed and filed it for record in the recorder's office of Cumberland county. His youngest son, the plaintiff in error Alva Ratcliff, lived at home and was present at the time the deed was executed. The defendant in error testifies that it was agreed between him and the grantees that after all danger was passed with reference to other bogus notes being presented the premises were to be re-conveyed to him. In this contention he is sustained by the plaintiff in error Alva Ratcliff. The plaintiffs in error Mary Cochonour and George Ratcliff testified that they did not know the deed was to be executed and had no actual knowledge of its execution until they received a letter from their father on September 11, 1901, and that there was no promise on their part to re-convey the premises upon the settlement of the bogus notes or at any other time. In the letter of September 11, 1901, the defendant in error uses the following language: "Dear children: * * * I wanted no judgment against me, so I could fix things so the rest of them that had bogus notes may pile them judgments up. I own nothing. We have made you, Mary and Alva a warranty deed for the Freize piece, reserving the control and use of it during our natural lives. It is included in the deed and put on record. That place up the river has a mortgage of $700 on it; that we deeded to Alva; he pays the mortgage. The forty acres that he had down here he deeded to your mother in exchange for that up there. I got Flave Tossy to make the deeds on Monday

and put them on record that day. * * * I intend to fight Feltner in February. I doubt if he makes much of a fight when he finds I own nothing," etc. On December 12, 1901, the defendant in error wrote as follows:

"JEWETT, ILL., *Dec. 12, 1901.*

"*Dear Children*—We are all well at present, hoping this will find you the same. We got your letter yesterday. I am almost worried to death. They still keep suing me. Turners sued me on two notes that they had at Casey for $195. Of course, they got a judgment. Turner, Robinson and wife, and two of the jury, Winslow and Williams, swore I stated on oath at Toledo, in the Turner trial, that them notes that they had sued on I never signed, but that they had notes at Casey that I had signed. Arthur sued for $75. I paid Brady $50 and he sued me for $65 more. Both got judgment. The constable was here this evening to serve summons on me that Meeker had sued me on two notes more, $200. It is no use for me to stand trial; they can prove anything they want to. I scheduled my property against an execution. We made a deed to this property in good faith. I am fearful that they will get witnesses to swear that I was deeding it away to keep from paying my debts. Of course the note that Cox and my name is on at Casey they will sue on in court; it is over $200. Had I known what they were going to swear at Greenup I could have got a dozen witnesses that would have swore that I never made such a statement. You and George knows I did not. It seems that they are determined to get all we have. It might be best to get shut of the place before court. The title is now in you children. You and George council the matter over and advise what you think the best to do. You may know a better plan than we do. Write soon.

YOUR PAP."

Shortly after the execution of the deed the old gentleman's wife died, and Mary Cochonour and George Ratcliff, who lived in Chicago, went to the funeral and assisted their 'father in selling his personal property and settling up his affairs. He then went to Ohio on a visit, and on September 1, 1902, went to Chicago to make his home with his children, where he resided until some time in September, 1905. Most of his life he had been addicted to the use of intoxicating liquors, but during the life of his wife she had been able, to a certain extent, to exercise control over him. Upon going to Chicago he began the use of liquor to excess

and so continued during his entire residence there, the most of which time he spent with his daughter, Mary. On January 18, 1905, a petition was filed in the probate court of Cook county, and upon a hearing before a jury he was adjudged to be a drunkard and spendthrift, incapable of managing and controlling his estate, and his daughter, Mary, was appointed his conservator. About the only property which he had consisted of the income from the lands in controversy and in which he had reserved a life estate, and it amounted to about $175 per year. After he was adjudged a spendthrift a contract was entered into between the three plaintiffs in error in which it was agreed that he should reside with his daughter and she was to receive $4 per week in payment of his board. On March 1, 1905, Alva Ratcliff, for a consideration of $300, conveyed his interest in the premises in controversy to his brother and sister. About the time the conservator was appointed the defendant in error consulted a lawyer in Chicago with reference to having the deed in question set aside. This seems to be the first complaint he had made with reference to the conveyance. On September 22, 1905, he left the home of his daughter and returned to Cumberland county, where he resided with the tenant of the lands in controversy, and on October 20, 1905, this bill was filed. These are the principal facts as they appear from the record, so far as we deem it necessary to state them in disposing of the case.

It seems to be conceded by all parties that a conveyance of property to hinder, delay or defraud creditors is binding on the parties thereto, and neither courts of law nor equity will aid the fraudulent grantor in recovering back the property or in enforcing the trust upon which the deed was made, but will leave them in the precise position in which they have placed themselves by their fraudulent act. (*Springfield Homestead Ass.* v. *Roll,* 137 Ill. 205; *Moore* v. *Horsley,* 156 id. 36.) But the defendant in error insists that this rule applies only where the parties are *in pari delicto,*

and if the debtor acts under circumstances of oppression, imposition or undue influence, so that it appears that his guilt is subordinate to that of the grantee, equity will grant relief, not on account of any right of the debtor, but for the purpose of preventing a greater fraud by the other party. In support of this contention he cites Bump on Fraudulent Conveyances, 448, and *Allen* v. *Jackson,* 122 Ill. 567. Conceding this to be the rule, the question arises whether the facts of this case come within the exception.

The allegation of the bill is, that the deed was obtained by the use of many undue arts, fraudulent practices, falsehoods, misrepresentations, etc. As to undue arts, fraudulent practices and undue influence there is absolutely no evidence in the record. The evidence shows that at the time the deed was executed Mary Cochonour and George Ratcliff, two of the plaintiffs in error, were in the city of Chicago, and that only Alva Ratcliff was present. The defendant in error of his own volition went to a notary public, executed the deed and himself placed it upon record. If there was any fraud whatever, it was in the alleged promise that after the judgment had been settled the property would be re-conveyed. The evidence in support of that allegation consists of the testimony of the defendant in error alone, which is contradicted by his subsequent conduct in failing to make any complaint for a period of almost four years. Alva Ratcliff testified to the promise to re-convey, but his testimony is also contrary to his subsequent conduct. The evidence shows that on March 1, 1905, he conveyed his interest to his brother and sister for the consideration of $300. If he had previously promised to re-convey to his father he presumably would not have conveyed for a valuable consideration to others.

The bill also alleges that after the execution of the deed the grantees began a course of inhuman treatment toward the grantor, treating him harshly and unkindly, until he was compelled to quit their home and move away. There is

no evidence in the record in support of this contention, but, on the contrary, the defendant in error himself testified that during the years that he lived with his daughter in the city of Chicago he never had a quarrel with her nor trouble of any kind, and the other evidence in the case clearly shows that he had a good home, with sufficient food and clothing, and was kindly treated by the family. His troubles in Chicago all came from his unfortunate habit of the use of intoxicating liquors. On one occasion at least he was robbed in a resort in the city of all the money he had with him. The evidence also shows that after he became dissatisfied with his home in Chicago and returned to the farm his daughter agreed to pay the tenant $2.50 per week for his board, and allowed him twenty-five cents per week for tobacco in addition to furnishing his clothes.

From a careful examination of the evidence we are convinced that the conduct of Mary Cochonour and George Ratcliff was prompted by a desire to preserve the estate and insure their father an income of at least $175 per year for his support, rather than to cheat and defraud him, as alleged in the bill.

From the clear preponderance of the evidence in this record as we read it, if the old gentleman was placed in possession of his property without a conservator he would soon waste it and become a charge upon his children or the public. We are not unmindful of the rule that a decree should never be disturbed on the ground that the weight of the evidence is against it unless it is manifestly so, and that due consideration ought to be given to the fact that the court saw the witnesses and could better judge of their respective credibility than a court of review. In this case, however, there is little or no material conflict in the testimony, and we regard the clear preponderance so contrary to the decree below as to require its reversal.

The decree will accordingly be reversed and the cause will be remanded, with directions to dismiss the bill.

*Reversed and remanded.*